Filed 12/28/20  P. v. Hall CA4/1
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D076563 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD148429) |
| JAMES WILLARD HALL, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Amalia L. Meza, Judge.  Affirmed.

David M. McKinney, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Lynne G. McGinnis, Deputy Attorneys General, for Plaintiff and Respondent.

INTRODUCTION

A jury convicted James Willard Hall and Jermaine "Ronnie" Sherrors of the 1999 murder of Steven Foth in 2001. The third perpetrator, Lena Hixon, testified at trial in exchange for a guilty plea and a reduced sentence. Following a series of appeals that led to the reversal of that judgment, Hall was retried and convicted in March 2019 of murder in the first degree. (Pen. Code, § 187, subd. (a).) The jury found true that Hall did so while engaged in the commission and attempted commission of kidnapping (Pen. Code, §§ 190.2, subd. (a)(17)(b), 207) and while engaged in the commission and attempted commission of robbery (Pen. Code, §§ 190.2, subd. (a)(17)(a), 211). As it had in 2001, the prosecution's case in 2019 relied largely on Hixon's testimony; she testified she was present and participated in the stabbing of Steven Foth, along with Hall and Sherrors.

In appealing this conviction, Hall raises six challenges. First, he contends the court's admission of a statement Hixon made to a friend over the phone while incarcerated in which she named Hall and Sherrors as the killers was reversibly prejudicial. Second, Hall argues the district attorney engaged in prosecutorial misconduct by eliciting testimony from Hixon that she had entered a plea agreement and the People had honored the terms of that agreement, releasing Hixon after a little over a decade. Third, Hall contends the exclusion of testimony by the lead detective regarding the substance of information provided to him by Kathrine D., who was conveying what she heard from Hixon while the two were incarcerated together, was improper. Fourth, Hall argues cumulative error. Then he contends that his sentence of life in prison without parole was unconstitutional in light of Senate Bill No. 1437, and finally he maintains he was impermissibly tried for

2

and convicted of kidnapping because that charge was dismissed by the district attorney during his 2001 trial.

We conclude that Hall forfeited his claim of prosecutorial misconduct and his remaining contentions lack merit. Accordingly, we will affirm.

I.

STATEMENT OF FACTS

Foth was a musician from San Diego who moved to San Francisco, where he opened a record store and played in a band. In the summer of 1999, he traveled to San Diego to stay with his friend Grace K., to help her run a summer camp. When he returned to San Francisco in August, he had difficulty adjusting because the record store was not doing well, and he was depressed. He was also having some issues with drugs and alcohol. Grace was concerned, and she asked him to return to San Diego to help with a business she had set up. She offered him a place to stay and some money in exchange. Foth returned to San Diego around September 6, 1999.

While cleaning her garage one day, they came across Foth's high school ring, which Foth kept. On September 29, 1999, Grace loaned Foth her new, black Audi so that he could visit their friend Steve P. She also gave him some money, her cell phone, and a Visa credit card to purchase gas. Grace also left a frog pen in her Audi and a wallet in her glove compartment. They planned to meet up that evening between 7:00 p.m. and 7:30 p.m. with friends for dinner. They had planned for their friend Ken H. to drive his car to Grace's house and travel with Foth in the Audi to the restaurant.

Steve P. spent part of that day with Foth writing a song. Foth said he needed money, but Steve did not want to give him any because he worried Foth would use it to buy drugs. Steve suggested they go to the movies or

3

surfing together, and Foth promised to come by the following day. Foth left Steve's place around 5:00 p.m.

Ken called Grace's home around 5:30 p.m. that day to confirm the meeting time, and Foth said he would be there to give Ken a ride around 6:30 p.m. At about 6:00 p.m., Grace called Foth, told him they were ready to meet, and asked him where he was. Foth said he was planning to stop by a bar to see another friend before returning to Grace's house. When Ken arrived at Grace's house, Foth was not there, but he had left a note saying he was going to see the friend at the bar. Ken waited 20-30 minutes and then attempted to call Grace's cell phone around 6:30 p.m. to tell her he was waiting for Foth. Foth answered the cell phone because Grace had loaned it to him that day, and Foth told Ken he would be back in a bit. It sounded like Foth was in the vehicle at the time. Foth never showed up, and no one saw or heard from him again.

Workers at the Pinery Christmas Tree Farms discovered Foth's body on September 30, 1999. They discovered his body six feet beyond a three-foot barbed wire fence. Leading up to the fence were drag marks, bloodstains, and footprints, and it appeared Foth had been folded in half, thrown over the fence and had rolled down the slope a few feet.

Foth was lying in a large pool of blood that seeped a couple inches into the earth. He had suffered 62 stab wounds to the neck area, nine to the chest area, eight to the face, and three to the hand. There were cuts and scrapes on his wrists and hands, consistent with defensive wounds. He also suffered blunt force trauma to the back of his head and the left side of the face, caused by more than one impact. A toxicology test was negative for drugs, prescription medication, and alcohol.

Also recovered from the scene were a folding knife with hairs and fingerprints on it, a pair of bloody white socks, Sherrors's wristwatch, two bloody size eight shoes, a bloody blue pullover T-shirt, Grace's frog pen, and Hixon's acrylic fingernail. There was a shoe print in the soil from an athletic shoe size 11 to 13 and a half. Hall and Sherrors each wore size 13 shoes.

At trial Hixon testified that in 1999 she was in a relationship with Michael W., who pimped her out and used her to facilitate cocaine sales. If someone wanted to purchase cocaine from Hixon, she would bring the person to Michael to complete the transaction. Michael controlled who Hixon would see, and he abused Hixon, choking her, slapping her, punching her in the stomach while pregnant, and taking the money she earned turning tricks. Michael introduced Hixon to Hall and Sherrors.

In September 1999, Hall, Sherrors, and several other individuals, including Michael, Jimmie W., and two young children, lived in an apartment complex on Wightman Street in East San Diego. Hall and Sherrors slept in Jimmie's bedroom. Hixon stayed at the apartment on and off as well.

At one point in September that year, Michael left town, leaving Hixon in the "care" of Hall and Sherrors. Michael told Hixon that if anyone wanted cocaine, she was to introduce that person to Hall and Sherrors. She also was expected to turn over any money from prostituting to them.

Hixon testified that on September 29, 1999, while she was hanging out at a taco shop, Foth approached Hixon in Grace's Audi and asked about acquiring cocaine. Hixon told Foth she knew where he could get cocaine, and Hixon got into the Audi and rode to the apartment complex on Wightman Street. She exited the vehicle, and Hall and Sherrors climbed in, leaving Hixon standing there and saying they would be back later. They returned 15-20 minutes later without Foth and instructed Hixon to get in. Hixon did

5

not think too much about it because it was not uncommon for people to trade the use of a car for drugs.

The group drove north on Interstate 15, then exited the freeway near a pumpkin patch. Hall and Sherrors exited the vehicle, and Hixon got out of the car to see what they were doing. Sherrors grabbed Hixon, causing one of her acrylic nails to break. After they were out of the vehicle, Hixon saw Hall and Sherrors open the trunk and remove Foth, whose hands were bound in front of his body.

Hall pulled Foth to the ground and held him down while Sherrors stabbed him. Sherrors continued to stab Foth even as Hall backed away. Sherrors told Hixon she would have to participate, or she would have to die. He placed the knife in her hand, and she stabbed Foth once in the chest as directed; Foth was still breathing at the time. Hall removed Foth's clothing and placed it in the trunk. Then Hall grabbed Foth's legs and Sherrors grabbed him under the arms to move the body. Hixon ran back to the car, and Hall and Sherrors returned shortly after.

Hixon noticed Sherrors was missing his watch and one of his shirts. The group stopped at a mini-mart and liquor store on the drive home, where Sherrors unsuccessfully tried to use Foth's ATM card to make purchases. He also showed Hixon a picture he had of her daughter and told her if she talked, he would kill her daughter. Hall and Sherrors left Hixon in the mid-city area and drove off.

Hall and Sherrors returned to the apartment complex on Wightman Street and went straight to their bedroom. Sherrors's shirt was inside out, and his shoes had blood on them. Around 11:45 p.m. that night, Sherrors placed a plastic bag full of clothes into a dumpster outside and burned it.

On October 2, 1999, police put out a press release requesting assistance in locating the Audi, which was missing.  The request was broadcast by various news organizations, and it gave a description of the vehicle and the license plate number.

A neighbor from the Wightman Street apartment complex testified she noticed a black Audi parked in front of her house and saw two Black men leave the apartment next to hers and get into the Audi around October 1 or 2.  A resident of the apartment where Hall and Sherrors were staying also testified they had seen both men get into the car.

On October 3, 1999, the Audi, which was parked near the apartment complex, was engulfed in flames.  Police recovered two cigarette butts from inside the vehicle with Sherrors's DNA on them, and a cigarette lighter with Foth's DNA.

After the Audi was burned, Sherrors paged Hixon, and when she called him back, he asked her if she had seen the news about the burning Audi.  Sherrors reminded Hixon not to say anything.

On October 9, 1999, police received an anonymous tip from a male who said Hixon told him that she and two other people killed Foth, and the other two people "torched" the Audi used in the crime.  The police arrested Hixon and interviewed her.  The detective told her she could be sentenced for life or receive the death penalty, and this was an opportunity to tell what she knew.  At first, Hixon denied knowing anything, but then she said she was aware of the murder, but she was not involved in it.  Next she told police the two men who had killed Foth were "Benjamin Wilson" and "Terrence Smallgreen."  She later explained that she had lied because Sherrors had threatened her daughter's life if she talked.  She also explained Ben Wilson was the name of

7

a friend of hers who lived in Los Angeles, and she made up the name Terrence Smallgreen.[1]

On October 12, 1999, Hixon telephoned her friend Eric B. from jail and told him Hall and Sherrors had killed Foth. She gave Eric their address and asked him to place a three-way call to see if they still lived there. If they did, she planned to give their information to investigators, so they could arrest Hall and Sherrors and keep her daughter safe. Eric called, and when he asked to speak to Hall and Sherrors, the woman who answered the phone said they were asleep.

The same day, Hixon spoke with police again. Hixon told police the real perpetrators were Hall and Sherrors, not the first two men she had named. She again denied participating.

On October 14, 1999, law enforcement went to the apartment on Wightman Street, where they found Hall and Sherrors asleep on the floor in one of the bedrooms. They found Foth's high school ring in Hall's jeans pocket. They arrested Hall and Sherrors.

When police interviewed Hall after his arrest, Hall said he did not kill anyone and did not know who did. He said he saw something about the murder and the car on the news, but he did not know Foth and had never seen the car. When police told him others had seen him in a black Audi, he denied having been in it. Eventually he said he may have touched a car like that in his neighborhood, but he had never touched a black Audi. He also denied knowing Hixon.

---

[1] Police later definitively ruled out Ben Wilson as a suspect because he had an alibi. Police never identified a person by the name of Terrence Smallgreen.

The People initially charged Hixon with Foth's murder, but she entered a plea agreement in June 2000, to reduce her charge and limit her sentence to 12 years in return for testifying truthfully against Hall and Sherrors. The plea agreement stated that if Hixon lied, the agreement would be terminated, and she could be prosecuted for perjury. Hixon was sentenced in early 2001, released from prison January 4, 2010, and completed parole January 4, 2013. By the time of Hall's trial in 2019, Hixon had completed a sober living program and was working as a care provider.

During trial, defense counsel extensively cross-examined Hixon to highlight inconsistencies in her statements to various individuals over the years. For example, on cross-examination Hixon acknowledged that she lied when she was arrested and denied drinking or using drugs when first arrested, and she denied a crack cocaine pipe found in her purse was hers. She also acknowledged lying to the police about who the perpetrators had been, her role in the stabbing, and her use of cocaine.

The defense attorney asked Hixon about a conversation she had with another inmate, Kathrine D., while incarcerated. Hixon denied ever speaking with Kathrine. Defense counsel offered Hixon a copy of the 2001 transcript to refresh her recollection, and Hixon agreed that in 2001 she testified she met Kathrine and had conversations with her in jail. Kathrine's testimony was read into the record because she was no longer available.

Kathrine testified that Hixon said there were two others with her at the crime scene, Hall and Sherrors; they all participated in stabbing Foth, and the others took $30 or $40 in cash and a ring and a watch from the victim. Hixon told Kathrine she took part in stabbing Foth once, and she was careful with how she handled the knife to try not to get fingerprints on it.

9

Hixon was surprised about how the knife felt going into the body because she expected it to feel soft and mush be it was actually tough and thick.

Kathrine further testified that Hixon told her she had solicited sex and dealt drugs and had even taken clients to a friend's house and then robbed the client. Finally, Kathrine testified that Hixon told her Hixon would only testify if she were granted full immunity.

Defense counsel highlighted other inconsistences. For instance, Hixon denied taking or touching any of Foth's property, which was not true. Hixon's purse was recovered during the investigation, and police recovered Grace's Visa card and Costco card from the purse, along with bonus cards, an AT&T card, a Wells Fargo card, and a Mastercard in Foth's name. And although Hixon testified at trial that Sherrors went into the mini-mart when they stopped on their way back from killing Foth, which was consistent with what she told a detective in October 1999, in a May 2000 interview, she told a detective Hall had gone into the store, which is what she testified happened during the 2001 trial.

Defense counsel also challenged Hixon's statements about drug sales. She testified at trial that she merely facilitated the sales for Michael but did not handle money herself, and when the attorney refreshed her recollection with testimony from the 2001 trial that she would earn $1,100 a day selling drugs, she had no recollection of having said that. She did admit that she testified in 2013 that she would earn $2,200 some days selling rock cocaine. She also testified in 2013 that Michael left her with drugs when he left town.

Other witnesses also testified about Hixon's truthfulness and credibility. Jacqueline P., a friend who met Hixon at church, thought of Hixon as a little sister, took care of Hixon's children while Hixon was incarcerated, and let Hixon live with her for a couple years after being

10

released from prison. Jacqueline testified that Hixon was not always honest; there were occasions when she did not tell the truth.

A DNA technical manager and another forensic specialist testified that Hall's DNA could not be conclusively linked to any of the items tested for DNA, including the clothing recovered from the crime scene, cigarette butts found in the Audi, a Gatorade bottle, and Foth's fingernail scrapings.

In his closing argument, Hall's attorney argued there was no forensic evidence tying Hall to the murder scene or pointing to his participation in the killing. He also argued Hixon was not a reliable witness because she lied to investigators, lied in giving trial testimony, and dodged direct questions to avoid answering them. He pointed out that Hixon sold drugs and prostituted, doing everything she could to survive. He reminded the jury that Hixon had lied to her friend Jacqueline. He also argued Hixon's decision to cooperate with the district attorney by testifying against Hall was an easy choice because it reduced her sentence to 12 years. Hall's attorney argued Hixon had every incentive to lie, and her lies were the only evidence against Hall.

The jury convicted Hall of first degree murder (Pen. Code, § 187, subd. (a)) and found true that Hall committed murder while engaged in the commission and attempted commission of kidnapping (Pen. Code, §§ 190.2, subd. (a)(17)(b), 207) and robbery (Pen. Code, §§ 190.2, subd. (a)(17)(a), 211). The court sentenced Hall to life without the possibility of parole. Hall timely appealed.

## II.

## DISCUSSION

### A.  Prior Inconsistent Statement

Hall first argues the court improperly admitted Hixon's statement to Eric naming Hall and Sherrors as the two men who killed Foth as a prior consistent statement.  We disagree.

### 1.  *Additional Facts*

The prosecution filed a motion in limine requesting it be permitted to introduce Hixon's October 12 statement to Eric in response to the defense's anticipated attacks to her credibility.  The prosecution argued the evidence was admissible as an exception to the hearsay rule under Evidence Code section 791, subdivision (b) because it came before Hixon entered a plea agreement with the People.  Defense counsel argued there were two biases in this case, first when the detectives told her she was in a lot of trouble and this was her opportunity to tell the truth and later when she was offered a plea deal with a reduction to something less than a life sentence.  He also argued that the bias started with a detective educating her about the possible death penalty and continued to the plea agreement.

At the hearing, defense counsel conceded he planned to highlight inconsistent statements Hixon made during interviews with detectives.  Nonetheless, he argued, because Hixon's conversation with Eric occurred after detectives told her she was in a lot of trouble, her statement did not meet the requirements of section 791, subdivision (b).

The trial court disagreed.  It concluded the statement was admissible because Hixon's credibility had been attacked, and the timing of the prior consistent statement was irrelevant.  Defense counsel argued he should be

12

permitted to challenge the truthfulness of the statement to Eric based on its timing, and the court agreed.

## 2. *Analysis*

We review a trial court's evidentiary rulings for abuse of discretion. (*People v. Clark* (2016) 63 Cal.4th 522, 590; *People v. Waidla* (2000) 22 Cal.4th 690, 725 (*Waidla*) [review trial court decision to admit prior consistent statements for abuse of discretion]; *People v. Alvarez* (1996) 14 Cal.4th 155, 210 (*Alvarez*).)

Evidence Code section 791 permits admission of a prior consistent statement as an exception to the hearsay rule when there has been an express or implied charge that the testimony is influenced by bias or improper motive and the statement was made before the bias or motive for fabrication arose. The rule operates in the disjunctive: A prior consistent statement is admissible if it is offered after an inconsistent statement is used to attack credibility. (*People v. Kennedy* (2005) 36 Cal.4th 595, 614 (*Kennedy*).) A prior consistent statement is also admissible if there is an express or implied charge that the witness's testimony was recently fabricated or influenced by bias or an improper motive and the consistent statement was made before the improper motive. (*Ibid.*) Additionally, when there is more than one bias or motive to fabricate, a witness's prior consistent statement does not need to occur before all the biases and motives to fabricate occurred. (*People v. Andrews* (1989) 49 Cal.3d 200, 210-211 (*Andrews*).) Instead, "a prior consistent statement is admissible if it was made before the existence of any one or more of the biases or motives that, according to the opposing party's express or implied charge, may have

influenced the witness's testimony." (*People v. Hayes* (1990) 52 Cal.3d 577, 609 (*Hayes*); see also *People v. Cannady* (1972) 8 Cal.3d 379, 388; *People v. Duvall* (1968) 262 Cal.App.2d 417, 421.)

Hall argues that Hixon's motive to fabricate arose before she made the prior consistent statement to Eric because police threatened her with a lengthy sentence and maybe the death penalty before Hixon called Eric. The People counter that there was more than one motive for bias in this case, and Hixon made the statement to Eric before the motive created by the plea offer; thus, it was properly admitted.

When the detective interviewed Hixon on October 9, 1999, he told her she could be put away for the rest of her life or until they enforced a death penalty sentence against her, and this was her only opportunity to explain what happened. Hixon testified that these potential consequences of a murder conviction scared her. She also testified that she gave two incorrect names initially even though she knew the identities of the real perpetrators because she wanted to protect her children, who had been threatened.

Although the detective's statements provided some motive to fabricate, a subsequent motive for bias or fabrication was created by the plea offer from the district attorney's office in June 2000. Hixon testified that after she signed the cooperation agreement with the district attorney's office, her duty was to be truthful. In exchange, the district attorney offered to seek less prison time. The defense attorney suggested to Hixon that had she not entered that plea agreement, she would not have testified against Hall and Sherrors at trial; thus, the plea agreement established a motive to fabricate.

The defense expressly and impliedly attacked Hixon's credibility, which established a prerequisite to introducing the prior consistent statement under Evidence Code section 791, subdivision (b). (*Kennedy*, *supra*, 36

14

Cal.4th at p. 614.) It is of no import that she made the statement to Eric after the October 9 interview with detective, whose statements created one motive to fabricate, because her statement to Eric occurred before the second motive to fabricate, the plea agreement.[2] (See *Hayes*, *supra*, 52 Cal.3d at p. 609; *Andrews*, *supra*, 49 Cal.3d at pp. 210-211.) Accordingly, the court did not abuse its discretion in admitting Hixon's testimony on this point.

### 3. *Harmless Error*

Even had the court's determination been erroneous, the admission of the statement was harmless under the facts of this case. To evaluate whether the admission of this statement was prejudicial, we ask whether it is reasonably probable a result more favorable to Hall would have been reached if the statement had been excluded. (*People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*); *People v. Kopatz* (2015) 61 Cal.4th 62, 86-87.)

The information that Hixon told Eric that Hall and Sherrors were involved in Foth's killing was introduced by other witnesses during the trial. Eric himself testified that he spoke to police in 1999. Part of his 1999 statement to police was read to the jury.[3] In it, he told police Hixon called him from jail and told him the person who killed Foth lived at 4690 Wightman Street, apartment 9, and their names were Hall and Sherrors. He told police Hixon asked him to make a three-way call to the apartment, so she

---

[2] In his reply brief, Hall argues the Attorney General's theory that a consistent statement is admissible if it predates a later motive to fabricate cannot be raised in appeal because it was not offered at trial. However, the district attorney raised this argument in the motion in limine on this issue.

[3] Eric could not recall the details of what he told police in 1999, even after reviewing his previous testimony. A paragraph of his statement to police was read to the jury as past recollection recorded.

15

could see if they were still at the residence, and when he did, a woman answered and said Hall and Sherrors were asleep.

Detective Valle testified that on October 9, 1999, Hixon named Ben Wilson and Terrence Smallgreen as the other participants in the crime. But then, before being charged with murder herself, Detective Howie interviewed Hixon on October 12, and at some point during that interview she told him Hall and Sherrors were the actual killers. Police were also able to determine they were living at the Wightman Street apartment, which is where they found the two men on October 15.

Additionally, Kathrine, who met Hixon when they were in jail in the same unit, testified that she had two in-depth conversations with Hixon, one in October and one in December 1999.[4] Kathrine testified that during both those conversations, and in a later conversation, Hixon named Hall and Sherrors as the men who killed Foth. Hall and Sherrors were the only people Hixon named when she talked to Kathrine.

Although the defense challenged Hixon's credibility repeatedly, asking about her drug use, her history selling drugs and prostituting, and whether her testimony in this trial was consistent with past testimony, and defense counsel identified many inconsistencies in her statements over the decades between Foth's murder and Hall's 2019 trial, after Hixon's first conversation with Detective Valle in which Hixon named Ben Wilson and Terrence Smallgreen, she consistently named Hall and Sherrors as the killers. Even if her own statement to this effect was inadmissible as a prior consistent statement, the other witnesses' testimony tells the same story: Hixon was

---

[4]     At trial, Hixon alternately denied having these conversations with Kathrine and denied remembering these conversations. Kathrine was unavailable, so her testimony from an earlier trial was read into the record.

steadfast in her identification of Hall and Sherrors from at least October 12 through the trial in 2019. It is not reasonably probable that Hixon's own testimony of what she told Eric tipped the evidence in favor of finding Hall guilty; nor is it reasonably probable in light of the testimony by others that a result more favorable to Hall would have been reached if Hixon's testimony about her statement to Eric had been excluded.

## B. Plea Deal Testimony

Hall argues the prosecutor's introduction of testimony that Hixon's plea deal was honored constituted prosecutorial misconduct because it was tantamount to vouching for Hixon's credibility since it implied she testified truthfully before and, therefore, was also testifying truthfully now. The Attorney General counters that such a claim is not cognizable on appeal because the defendant did not make a timely objection at the time of the alleged misconduct to cure any potential harm. Hall recognizes that forfeiture can result from the failure to object, but he asks us to exercise our discretion. We decline to do so.

### 1. *Additional Facts*

During direct examination, Hixon testified she pled guilty to assault with a deadly weapon, infliction of great bodily injury, and conspiracy to distribute cocaine and received a 12-year sentence in state prison. In exchange, Hixon agreed to testify truthfully on behalf of the People. Hixon understood that if she lied, the benefits she received under the terms of the plea agreement would be terminated. A copy of the plea agreement was admitted without objection.

Hixon said she was sentenced in 2001 and released in January 2010, after serving 10 years and three months, then supervised by a parole agent for three years. She also explained that after she was released, she went to

17

sober living, became an employee of the sober living program, and at the time of trial, she was working fulltime.

Hixon also testified that the terms of her original agreement were fulfilled, and she was not testifying at the trial pursuant to any agreement with the district attorney's office.

On cross-examination, defense counsel asked Hixon if the biggest obligation under her plea agreement was to testify for the district attorney, and she responded that it was to testify truthfully. Defense counsel asked if she could be charged with perjury if she lied, and Hixon said she could. Then he asked if she would "go back to prison" if convicted of perjury, to which the prosecutor objected; the court sustained the objection. Next defense counsel asked if the district attorney was the one who would determine whether or not to prosecute Hixon for perjury; the prosecution objected again, and the court sustained that objection. The prosecutor also objected to the next series of questions, in which the defense attorney asked if Hixon could be spending the rest of her life in prison had she not testified for the People, and commented that instead she was going home to see her kids that night. The court sustained those objections as well.

### 2. *Forfeiture*

"It is settled that, following a jury trial, a claim of misconduct is not cognizable on appeal absent a timely objection if an objection and admonition would have cured the harm." (*People v. Scott* (1997) 15 Cal.4th 1188, 1217; *People v. Davis* (1995) 10 Cal.4th 463, 537; *People v. Partida* (2005) 37 Cal.4th 428, 433-434 (*Partida*).) In such situations, a defendant must " 'make a timely and specific objection and ask the trial court to admonish the jury to disregard the impropriety.' " (*People v. Clark* (2011) 52 Cal.4th 856, 960,

18

quoting *People v. Cole* (2004) 33 Cal.4th 1158, 1201; see also *People v. Dennis* (1998) 17 Cal.4th 468, 521 (*Dennis*).)

Hall contends he is not precluded from raising the issue for the first time on appeal because an admonition would not have cured the harm. He maintains that the government honoring the terms of the 2001 plea agreement was evidence that the prosecution believed Hixon's testimony was truthful, and no admonishment could have eliminated the impact of the prestige placed behind Hixon's credibility via the district attorney's office.

Defendants are required to object to perceived prosecutorial error or misconduct at trial because doing so provides the trial court an opportunity to exclude the statement or to limit its scope to reduce or eliminate undue prejudice. (*Partida*, *supra*, 37 Cal.4th at p. 434.) It also gives the other party an opportunity to take steps to " 'minimize the prospect of reversal.' " (*Ibid.*) For example, here, had Hall objected at trial to these questions, or to Hixon's specific responses, the prosecutor could have withdrawn or reframed the questions or explained why the objection should not be sustained. (See *ibid.*)

Defense counsel asked Hixon if she could be charged with perjury if she did not testify truthfully. Then when defense counsel asked Hixon if the district attorney was the one who would determine whether or not to prosecute for perjury, the prosecution objected, and the court sustained that objection. This demonstrated a willingness to consider objections surrounding the terms of the plea agreement and its application.

However, the defense attorney failed to object to the prosecutor's questions. The defense could have objected when the prosecutor asked if Hixon had served the promised 12 years, or when the prosecutor asked Hixon how much time she actually spent incarcerated. Had defense counsel given the court an opportunity to make a determination regarding admissibility of

19

the challenged statements, the court would have been able to prevent the jury from hearing the testimony to which Hall now objects.[5]  None of these questions was so serious that an objection and admonition would have been inadequate to cure possible harm.  (*People v. Wharton* (1991) 53 Cal.3d 522, 566 (*Wharton*).)  Thus, this argument was forfeited.

### 3. *Ineffective Assistance of Counsel*

Hall maintains that if his trial attorney's failure to object forfeited the claim for appeal, his attorney provided ineffective assistance of counsel. However, " 'a mere failure to object to evidence or argument seldom establishes counsel's incompetence.' "  (*Wharton, supra*, 53 Cal.3d at p. 567.)

To demonstrate ineffective assistance of counsel, Hall must demonstrate his trial attorney's performance (1) fell below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performance prejudiced him.  (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688.)  We evaluate the attorney's conduct with deference, and we "indulge a strong presumption that counsel's acts were within the wide range of reasonable professional assistance."  (*Dennis, supra*, 17 Cal.4th at p. 541.)

" ' "[I]f the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged[,] . . . unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation," the claim on appeal must be rejected.' "  (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266 (*Mendoza Tello*); *People v. Cash* (2002) 28 Cal.4th 703, 734 [" ' " 'record must affirmatively disclose the lack of

---

[5]    We note that a jury would not expect a prosecutor intentionally to elicit false testimony from one of its witnesses, under a plea agreement or otherwise.

rational tactical purpose for challenged act or omission.' [Citation.]" '
[Citation.]"].) "A claim of ineffective assistance in such a case is more
appropriately decided in a habeas corpus proceeding." (*Mendoza Tello*, at
pp. 266-267.)

Defense counsel may have had tactical reasons for not objecting to this
testimony. The defense's emphasis was on the various ways Hixon's earlier
testimony and current trial testimony were inconsistent, and her
truthfulness at earlier proceedings may have highlighted her untruthfulness
in the current trial, causing the jury to question her credibility and memory.
Or the defense may have determined that challenging the district attorney's
questions about the plea agreement's terms and whether they were
completed would have further emphasized and ingrained the consistencies in
Hixon's stories, rather than the inconsistencies upon which the defense was
focusing. Indeed, the defense attorney cross-examined Hixon about the terms
of the plea agreement, intimating through his questions that Hixon was
biased in favor of the prosecution and was motivated to lie in 2001 and
because she believed she could be prosecuted still for not testifying as the
district attorney anticipated, there was an ongoing bias to fabricate what
happened. These possibilities suggest there may have been a tactical reason
not to object. Thus, we must reject the ineffective assistance of counsel claim.
(*Mendoza Tello*, *supra*, 15 Cal.4th at p. 266.)

### C. Hearsay Testimony of Detective Howie

Hall contends the court erroneously excluded testimony from Detective
Howie as hearsay when it sustained objections regarding the substance of his
conversations with Kathrine about what Hixon told Kathrine while the two
were in jail together. Hall argues the evidence should have been admitted to
show Hixon was lying when she testified that she never spoke with Kathrine,

21

not for the truth of the substance of Kathrine's testimony, i.e., that Hixon participated in Foth's murder by stabbing him.  The Attorney General argues the evidence was inadmissible double hearsay, both as to the statement by Hixon to Kathrine and as to the statement by Kathrine to Detective Howie.

### 1. *Additional Facts*

During Hixon's testimony, defense counsel questioned her about what she told Kathrine when they were incarcerated at the same time.  Hixon denied talking with Kathrine.  She repeatedly said she had made no statements about her case to Kathrine while the two of them were in jail.  She testified she had been in segregation, and she would have had no opportunity to have a conversation with Kathrine.  But when defense counsel asked Hixon if she testified in 2001 that she met Kathrine while in jail with her, Hixon said she could not recall.  Defense counsel offered Hixon a copy of the 2001 transcript to refresh her recollection, and Hixon agreed that in 2001 she testified she met Kathrine and had conversations with her in jail.  Then defense counsel asked Hixon if she testified truthfully in 2001, and Hixon said she had.  But when he followed up and asked if she discussed the facts of the case with Kathrine, Hixon again said she did not.  Again, defense counsel offered a copy of the transcript from 2001 to refresh Hixon's recollection, and she acknowledged that in 2001 she testified that she had discussed the case with Kathrine.  Defense counsel then asked, "And today you're lying to protect yourself, right?"  Hixon responded she was not.

Later, prosecutors questioned lead investigator Detective Howie.  Detective Howie testified that Kathrine was an inmate at Las Colinas who said she spoke with Hixon about the crime.  When defense counsel asked if Kathrine told him that Hixon stabbed Foth, the prosecutor objected.  When defense counsel next asked if Detective Howie got information from Kathrine

that Hixon stabbed Foth, the prosecutor again objected. Next, defense counsel asked what sources, aside from Eric, informed Detective Howie that Hixon stabbed Foth. The prosecutor objected. Each objection was sustained as hearsay. Finally, defense counsel asked when Hixon first admitted to stabbing Foth, and Detective Howie said the first time she admitted it to law enforcement was in May 2000, during a "free talk" at the district attorney's office.

That afternoon, Kathrine's 2001 testimony was read into the record. Kathrine testified that she met Hixon while the two were in custody and the two were able to talk either through their cells or in a little patio area. Kathrine was a paralegal who was incarcerated on prescription forgery charges, and Hixon wanted to tell Kathrine about her situation to see what Kathrine thought might happen. The two had two in-depth conversations, one in October 1999 and the other in December 1999.

Hixon told Kathrine that she met Foth when she approached him outside a taco shop and asked if he wanted to acquire her services as a prostitute. Hixon also described the murder. She said she was with Hall and Sherrors, they all participated in stabbing Foth, and she lost a fake nail at the scene, but she was not sure if it broke during the struggle with Foth or while she held him down to be stabbed. Hixon told Kathrine that Hall and Sherrors took $30 or $40 in cash and a ring and a watch from the victim. Kathrine also testified that Hixon told her she was apprehensive to make a deal with the district attorney, and in particular that she was apprehensive to testify against Hall, in part because he was a long-time and close friend.

### 2. *Analysis*

We apply "the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence, including one that turns on the

hearsay nature of the evidence in question [citations].” (*Waidla*, *supra*, 22 Cal.4th at p. 725; *Alvarez*, *supra*, 14 Cal.4th at pp. 203-204; *People v. Zavala* (2013) 216 Cal.App.4th 242, 249; *People v. Hovarter* (2008) 44 Cal.4th 983, 1004.) We will not disturb such a ruling and reverse judgment unless the trial court exercised its discretion in “ ‘arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.’ ” (*Hovarter*, at p. 1004.) Hearsay occurs when there is an out-of-court statement offered to prove the truth of the matter asserted within the statement. (Evid. Code, § 1200, subd. (a).) Out of court statements that are not offered to prove the matter asserted in them are not hearsay. (*Jazayeri v. Mao* (2009) 174 Cal.App.4th 301, 316.) Hearsay is inadmissible unless an exception applies. (Evid. Code, § 1200, subd. (b).) When there are multiple levels of hearsay, each level must fall within an exception for the statement to be admissible. (*Id*., § 1201.)

Hall argues that the first layer of hearsay, the statements made by Hixon to Kathrine, are admissible as prior inconsistent statements (Evid. Code, § 1235) and admissions by a party opponent (*id*., § 1220), both exceptions to the hearsay rule. He contends the second layer of hearsay, the repetition of those statements by Kathrine to police, is nonhearsay because it was offered primarily to show that Hixon was lying when she testified that she never spoke with Kathrine, not for the truth of the matter asserted therein, i.e., that Hixon participated in Foth’s murder by stabbing him.

We address only the second layer of the hearsay objection, Kathrine’s statements to Detective Howie, because Hixon’s statements to Kathrine were admitted without objection through Kathrine’s testimony.

Hall argues that the statement was nonhearsay because it was not presented for the purpose of proving what Hixon said to Kathrine but was

24

instead presented as evidence that Hixon spoke to Kathrine, to emphasize that Hixon's testimony that she never spoke to Kathrine was a lie, thereby impugning her credibility. However, this does not bear out in the exchange between Detective Howie and the defense attorney. Detective Howie testified Kathrine was an inmate at Las Colinas who said she spoke with Hixon about the crime. This testimony provided the information Hall now says he wanted conveyed. There was no objection to that question or answer. It was only when defense counsel asked Detective Howie if Kathrine told the police that Hixon admitted she had stabbed Foth that the prosecution objected. In other words, the testimony that Hall now argues should have been admitted, that Hixon talked to Kathrine, was admitted.

We are also not persuaded by Hall's contention that the testimony was admissible to explain why the investigation took the course that it did because police had no information suggesting that Hixon had also participated in the stabbing. Hall argues that Detective Howie "obtained reason to delve further into Hixon's role" because of Kathrine's "revelations to him." Hall clarifies in his reply brief that he is not arguing that it was Kathrine's information that led police to focus on Hixon, which then led authorities to Hall. Instead, Hall argues that Kathrine was the first person to tell authorities that Hixon admitted to actually stabbing Foth. However, this does not appear to be the focus of the defense questioning during trial because defense counsel never asked about the timing of Kathrine's statements to authorities. Although Detective Howie testified that the first time Hixon admitted to law enforcement that she stabbed Foth was when he heard her tell the district attorney, and Kathrine testified that Hixon admitted during their conversations before the end of 1999 that she personally had stabbed Foth, no one asked when Kathrine spoke to police or

25

what impact that had on the investigation. Hall does not explain or argue that the information coming earlier from Kathrine affected the investigation. Thus, the court's conclusion that the substance of Kathrine's statements to police also were not subject to the hearsay exception because they were not directed at demonstrating how the investigation unfolded was not an abuse of discretion.

### 3. *Harmless Error*

Finally, we note that even had the court erred by excluding this testimony by Detective Howie, the error was harmless. Hall maintains that the exclusion of Detective Howie's testimony on this point violated his Sixth and Fourteenth Amendment rights to present a complete defense, and also violated the California Constitution's due process clause and right to truth in evidence. Because of this, he maintains that the State must demonstrate any error is harmless beyond a reasonable doubt (*Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*)) and claims "it appears ' "reasonably probable" ' the defendant would have obtained a more favorable outcome had the error not occurred." (*People v. Ledesma* (2006) 39 Cal.4th 641, 716; *Watson*, *supra*, 46 Cal.2d at p. 836.) The Attorney General meets this burden.

First, if the statement from Kathrine to Detective Howie were admissible as nonhearsay, i.e., to show that Hixon was lying and nothing more, the substance of Hixon's statement to Kathrine as relayed by Kathrine to Detective Howie was unnecessary; all that needed to be elicited was that Kathrine told Detective Howie that Hixon shared information with her about the crime, not the substance of that conversation, because the defense wanted to show Hixon was lying. This testimony was admitted. Second, the defense challenged Hixon's credibility on this point by eliciting from Hixon that she never spoke to Kathrine, then challenging that testimony by eliciting a

26

concession that she previously testified truthfully that she had in fact spoken to Kathrine. It also made this point by questioning Detective Howie directly and learning that Kathrine told him she spoke with Hixon. Thus, if the goal were to attack Hixon's credibility by pointing out inconsistencies on this point, the defense did so.

Third, the substance of the information Kathrine provided to detectives was admitted into evidence because the entirety of Kathrine's previous testimony, in which she herself detailed what Hixon told her, was read into the record. In admitting this testimony, and giving the jury the opportunity to consider the details of Kathrine's statements to police, the court allowed the jury to consider whether Hixon was lying and also to consider the substance of the testimony as evidence of the truth of the matter asserted therein. Finally, Hixon herself admitted she stabbed Foth, which was the substance of the information Kathrine provided to police. Thus, this information, which challenged what kind of person Hixon was, was before the jury as well. Given these details, there is no reasonable doubt that the exclusion of this specific testimony affected the outcome. (*Chapman*, *supra*, 386 U.S. at p. 24.) For the same reasons, it is not reasonably likely that had the court admitted Detective Howie's statement, the outcome would have been more favorable to Hall. (*Watson*, *supra*, 46 Cal.2d at p. 836.)

### D. Cumulative Errors

Hall contends that even if none of the errors he identified individually requires reversal, their cumulative effect does, and because this case depended largely on the testimony of Hixon, it must be reversed. He notes removing the evidence of Hixon's testimony that she told Eric that Hall and Sherrors were the perpetrators, and the evidence that Hixon previously testified under oath to the same general information and was not prosecuted

27

for perjury, plus including Detective Howie's testimony that Kathrine told police that Hixon had stabbed Foth would have changed the outcome of the case.

Hall was entitled to a fair trial, not a perfect one. (*People v. Cunningham* (2001) 25 Cal.4th 926, 1009.) Here, there are no cognizable individual errors; thus, there is nothing to accumulate. (*People v. Seaton* (2001) 26 Cal.4th 598, 639.) Moreover, even excluding the aforementioned testimony by Hixon and admitting the testimony by Detective Howie, it is not reasonably probable the outcome would have been different because all the aforementioned information was shared with the jury through other witnesses. Finally, the defense thoroughly and repeatedly attacked Hixon's credibility on a myriad of points throughout the trial. It was up to the jury to consider that information alongside Hixon's testimony in reaching its verdict. Removing these specific, alleged errors would not have made a difference in the jury's ability to evaluate Hixon's credibility.

### E. Constitutionality of Life Without Parole Sentence

Hall challenges the constitutionality of Penal Code section 190.2. He argues that because Senate Bill No. 1437 modified Penal Code section 189 to make the elements for felony murder with reckless indifference to human life identical to the elements of special circumstances felony murder, a sentence of life in prison without parole under Penal Code section 190.2 violates the Eighth Amendment to the federal Constitution. The Attorney General argues Hall lacks standing to bring the claim and contends that even if Hall had standing, the law is not unconstitutional. We agree with the Attorney General.

28

### 1. *Standing*

Parties who challenge the death penalty on Eighth Amendment grounds must have standing to do so. (*Whitmore v. Arkansas* (1990) 495 U.S. 149, 161.) This means a party must allege a personal injury that can be traced to unlawful conduct which can be redressed. (*Allen v. Wright* (1984) 468 U.S. 737, 751.) That injury must not be speculative, and the harm must not be hypothetical. (*Houston v. Roe* (9th Cir. 1999) 177 F.3d 901, 907.) A defendant sentenced to life without parole cannot argue the Penal Code violates the Eighth Amendment on the basis that the law set vague and arbitrary standards for when the death penalty can be imposed because there is no risk that the defendant will be arbitrarily sentenced to death; there is no actual or threatened injury. (*Houston*, at pp. 906-907.) Because Hall does not and cannot identify a nonspeculative, actual or threatened injury, he lacks standing to raise this claim.

### 2. *Constitutionality*

Even if Hall had standing, we would nonetheless conclude the challenged statute is constitutional. The Eighth Amendment to the federal Constitution prohibits cruel and unusual punishment. In so doing, it imposes restrictions on the application of the death penalty. (*People v. Bacigalupo* (1993) 6 Cal.4th 457, 462.) One restriction is that any legislative scheme that prescribes the death penalty "must include some narrowing principle that channels jury discretion and provides a principled way to distinguish those cases in which the death penalty is imposed from the many cases in which it is not." (*Ibid.*) When a death-eligible criterion does not meet that standard, it is considered impermissibly vague. (*Ibid.*) Accordingly, state death penalty laws must narrow the class of convicts eligible for a capital

29

punishment from every defendant convicted of murder.  (*Tuilaepa v. California* (1994) 512 U.S. 967, 972, 980.)

Penal Code section 190.2 includes a list of special circumstances that serve this function; they "are not so numerous and broadly interpreted that they fail adequately to narrow the class of persons eligible for death." (*People v. Powell* (2018) 5 Cal.5th 921, 963.)  The jury must also conclude in a separate sentencing phase that the defendant is eligible for a capital punishment before the court can sentence the defendant to death.  (Pen. Code, § 190.4, subd. (a).)  Moreover, our Supreme Court has concluded that "first degree murder liability and special circumstances findings may be based upon common elements without offending the Eighth Amendment. [Citations.]"  (*People v. Catlin* (2001) 26 Cal.4th 81, 158.)  "Because the special circumstances listed in [Penal Code] section 190.2 apply only to a subclass of murderers, not to all murderers [citation], there is no merit to [the] contention . . . that our death penalty law is impermissibly broad. [Citations.]"  (*People v. Beames* (2007) 40 Cal.4th 907, 934.)

F.  Special Circumstances, Kidnapping

Hall contends that because the court dismissed the kidnapping special circumstance allegation at the prosecutor's request during the 2001 trial, double jeopardy prohibited trial on that charge in 2019.  Hall bases this claim on his conclusion that the charge was dismissed for insufficient evidence. However, as the Attorney General notes, the charge was not dismissed for insufficient evidence.  Accordingly, we will affirm.

1. *Additional Facts*

During Hall's 2001 trial, he was charged with murder and two special circumstances:  robbery and kidnapping.  At the jury instruction conference, the court indicated some concern about whether there was evidence to

30

corroborate Hixon's testimony on the special circumstance of kidnapping and asked the prosecutor to provide his view of the evidence on that point. Defense counsel stated he was under the impression that "the People were contemplating rethinking their position on the kidnap," and the court responded that the district attorney could have some time to ponder it. The next court day, the prosecutor said he had done some research and was moving to dismiss the special circumstance regarding kidnapping. The court dismissed the kidnapping special circumstance "on motion of the district attorney."

## 2. *Analysis*

Both the federal and state Constitutions prohibit a person from twice being placed in jeopardy of the same offense. (*People v. Hatch* (2000) 22 Cal.4th 260, 271 (*Hatch*), citing *Benton v. Maryland* (1969) 395 U.S. 784, 794 [applying Fifth Amendment to states through Fourteenth Amendment]; *United States v. Wilson* (1975) 420 U.S. 332, 342 [protecting defendants from multiple trials]; Cal. Const., art. I, § 15.) When the accused has been acquitted in a final judgment, a second trial would be presumptively unfair. (*Arizona v. Washington* (1978) 434 U.S. 497, 503.) A trial court's action prior to a jury verdict is the "legal equivalent of an acquittal" if the court's action "constitutes a ruling that the prosecution's evidence was insufficient to support a conviction, regardless of whether that ruling is legally correct. [Citations.]" (*People v. Eroshevich* (2014) 60 Cal.4th 583, 589.) However, when the court does not make a legal finding of insufficient evidence, jeopardy does not attach. (*Hatch*, at pp. 273-274.) When courts dismiss a charge for insufficient evidence under Penal Code section 1385, they must "make their rulings clear enough for reviewing courts to confidently conclude

they viewed the evidence in the light most favorable to the prosecution and found that no reasonable trier of fact could convict." (*Hatch*, at p. 273.)

Here the court made no specific findings. The prosecutor did not offer a reason for seeking dismissal of the kidnapping charge in 2001. He did not tell the court what research he had conducted or why he opted to proceed only with the robbery special circumstance. Although the court asked whether there was evidence to corroborate the kidnapping charge, it is not clear if that is because there was none or if the district attorney simply did not share his theory on this point. The trial court did not make any statement that would enable us to conclude it viewed the evidence regarding kidnapping in a light favorable to the prosecution but found no reasonable trier of fact could convict on that count. (See *Hatch*, *supra*, 22 Cal.4th at p. 273.) Indeed, the trial court did not make any findings about sufficiency of the evidence at all; it simply granted the People's request. Accordingly, we cannot conclude double jeopardy attached here.

DISPOSITION

The judgment is affirmed.


HUFFMAN, Acting P. J.

WE CONCUR:



IRION, J.



GUERRERO, J.

32